# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

        Plaintiff,

KAREN BOMBACI,

        Plaintiff-Intervenor,

      v.

JOURNAL COMMUNITY PUBLISHING
GROUP, INC.,

        Defendant.

Case No. 04-C-0326

## ORDER

Plaintiff Equal Employment Opportunity Commission ("EEOC") filed a complaint, alleging that defendant Journal Community Publishing Group, Inc. ("JCPG") allowed plaintiff-intervenor Karen Bombaci to be sexually harassed by two male co-workers for several years. Bombaci also alleges that JCPG retaliated against her after she reported her co-workers' conduct by allowing her to be isolated and ignored by co-workers, yelled at by co-workers who supported the two male harassers, and assigned to less desirable work until she was constructively discharged. JCPG has filed a motion for summary judgment. For the reasons stated below, the court grants JCPG's motion.

## BACKGROUND[1]

JCPG, formerly known as Add, Inc., publishes community newspapers and owns a printing facility in Hartland, Wisconsin. (DPFOF ¶¶ 4, 7.) On August 24, 1998, Bombaci began working for JCPG at the Hartland facility as a first shift pressroom jogger. (DPFOF ¶ 22.) As a pressroom jogger, Bombaci was responsible for taking newspapers off the press and either stacking them in piles or putting them on a skid, taking out the trash and washing the machines. (DPFOF ¶ 24; Bombaci Dep. 47-48.) Bombaci worked with other joggers, including Sarah Stoll. (DPFOF ¶ 25.) Bombaci also worked with various press operators. (PPFOF ¶ 5.) Bombaci alleges that two of the press operators, Brian Wampner and Glenn Mueller, subjected her to sexual harassment from the beginning of her employment in August 1998 until April 12, 2001, (PPFOF ¶ 7), when Wampner and Mueller were fired for inappropriate conduct of a sexual nature. (PPFOF ¶¶ 101-106.) James Creasey was employed by JCPG as the plant manager of the Hartland facility. (DPFOF ¶10.) As plant manager, Creasey's duties included supervising, evaluating, disciplining and scheduling employees, inventory control, scheduling press runs and job estimating. (*Id.*) Creasey supervised joggers and press operators, including Bombaci, (DPFOF ¶ 26; Bombaci Dep. 54), Wampner, (Wampner Dep. 13-14), and Mueller. (Mueller Dep. 28.) Creasey reports to Gary Jasiek, vice president of JCPG. (Creasey Dep. 11-12; Jasiek Dep. 7.)

---

[1]The court will cite the defendant's proposed findings of fact as "DPFOF" and the plaintiffs' proposed findings of fact as "PPFOF."

Bombaci states that Wampner and Mueller sexually harassed her on a frequent basis. According to Bombaci, Wampner grabbed Bombaci's breasts "all the time." (PPFOF ¶ 46; Bombaci Dep. 136.) In response, Bombaci states that she yelled at Wampner. (Bombaci Dep. 144.) Bombaci states that Mueller and Stoll witnessed the behavior. (Bombaci Dep. 136.) Stoll denies seeing Wampner or Mueller grab Bombaci's breasts. (Stoll Dep. 72.) Bombaci alleges that Wampner pulled her shirt down to her chest to see her bra "all the time." (PPFOF ¶ 46; Bombaci Dep. 144-45.) Bombaci states that Mueller, Stoll, and possibly another co-worker, Nick Schrimpf, witnessed the behavior. (Bombaci Dep. 145.) Bombaci states that Wampner placed a newspaper between his legs and shoved the newspaper between her legs. (PPFOF ¶¶ 43, 46; Bombaci Dep. 131-34.) Bombaci states that she "told him to knock it off," "told him to leave me alone," and "swore at him, to get the hell away from me." (Bombaci Dep. 133.) Bombaci states that Mueller and Stoll witnessed the behavior. (Bombaci Dep. 132.) Stoll states that she recalls Wampner placing a newspaper between his legs but does not recall if he poked Bombaci in the buttocks with the newspaper. (Stoll Dep. 61.) Press operator Paul Hansen states that he saw Wampner place a newspaper between his legs and walk up behind Bombaci at least twice. (Hansen Dep. 34-35.) Hansen states that Bombaci told Wampner to "get out of here." (Hansen Dep. 35.) Bombaci states that Wampner bent over near her and pretended to have sex with her. (PPFOF ¶ 46; Bombaci Dep. 154.) Bombaci states that Mueller and Stoll witnessed the behavior and laughed. (Bombaci Dep. 154.) Bombaci states that Wampner picked her up

- 3 -

and yelled, "She's humping me." (PPFOF ¶ 46; Bombaci Dep. 166-67.) In response, Bombaci states that she screamed, yelled, and swore. (Bombaci Dep. 167.) Bombaci states that Mueller and Stoll witnessed the behavior and laughed. (Bombaci Dep. 167.) Bombaci states that Mueller and Wampner rubbed their penises against Bombaci's buttocks and that Wampner would pull his pants down to his knees. (PPFOF ¶ 46; Bombaci Dep. 179-83.) Bombaci states that Wampner, Mueller, and Stoll witnessed the behavior. (Bombaci Dep. 181-83.)

Bombaci states that Wampner and Mueller would make sexually explicit remarks toward Bombaci. For example, Bombaci states that Wampner and Mueller compared hand soap to semen while Bombaci washed her hands. (Bombaci Dep. 140, 183.) In addition to Stoll, Bombaci believes that Brad, another press operator, and Hansen heard these comments. (Bombaci Dep. 183-84.) Bombaci states that Mueller told her to "suck on my meat," and that Mueller and Wampner discussed sex acts. (Bombaci Dep. 179-80.) Hansen states that he overheard this comment. (Hansen Dep. 16.) Bombaci states that Mueller and Wampner asked Bombaci to describe her private body parts. (Bombaci Dep. 179-80.) Stoll states that Wampner and Mueller teased Bombaci "a couple times a week," including making sexual comments. (Stoll Dep. 64-66.) Stoll states that Bombaci complained to her about Wampner and Mueller's conduct. (Stoll Dep. 66.) Hansen states that Wampner and Mueller engaged in horseplay daily, and sometimes it was joking or horseplay of a sexual nature. (Hansen Dep. 48, 108.) Bombaci complained to him more than once about Wampner and Mueller's conduct. (Hansen Dep. 28-30.) Hansen states that

Bombaci appeared upset and troubled when she spoke about Wampner and Mueller's conduct. (Hansen Dep. 29-30.) Hansen states that he witnessed Bombaci object to sexual comments made by Wampner and Mueller. (Hansen Dep. 31.) Hansen states that Stoll "joked along with" Wampner and Mueller when they made a sexual comment. (Hansen Dep. 33-34.) Hansen states that he told Wampner and Mueller to stop, (Hansen Dep. 48), and considered reporting Wampner and Mueller's conduct to someone in management. (Hansen Dep. 49.) Mueller acknowledges that he engaged in sexual teasing. (Mueller Dep. 31.) Mueller acknowledges that Bombaci told him to stop his dirty talk. (Mueller Dep. 112.)

In January 2001, Wampner threw a crushed paper cup that hit Bombaci in the face and cut her under the eye. (Wampner Dep. 33-36; Creasey Dep. 50.) Creasey noticed the cut and asked Bombaci what happened. (Creasey Dep. 50.) Bombaci told Creasey that Wampner threw a cup which hit her in the eye. (Creasey Dep. 50.) Wampner states that he was hit with a paper cup and that he threw a paper cup in the direction of a group of three people that included Bombaci. (Wampner Dep. 33-35.) Creasey issued a written warning to Wampner. (Wampner Dep. 33-34.) In February 2001, Wampner yelled at a group of younger workers and used profane language. (DPFOF ¶ 63; Creasey Dep. 61-65.) Creasey gave Wampner an oral warning. (DPFOF ¶ 63; Creasey Dep. 64.) In February 2001, Creasey noticed that Stoll and Bombaci rarely worked with Wampner and Mueller. (DPFOF ¶ 62; Creasey Dep. 106-08.) Creasey asked Stoll why she and Bombaci rarely worked with Wampner and Mueller, and Stoll responded that "those guys are really bad the way

they talk." (DPFOF ¶ 62; Creasey Dep. 106-07.)  Creasey asked Stoll for details and examples of what Wampner and Mueller were saying, but Stoll refused to provide any further information, stating that she did not want to get them in trouble.  (DPFOF ¶ 62; Creasey Dep. 109.)  Creasey asked Bombaci for details and examples of what Wampner and Mueller were saying but Bombaci refused to provide any information. (DPFOF ¶ 62; Creasey Dep. 109, 111-12.)  Bombaci denied that there was any inappropriate conduct.  (DPFOF ¶ 62; Creasey Dep. 111-12.)

On March 27, 2001, Geraldine Dresen, JCPG's vice president of human resources, (DPFOF ¶ 11), Jim Clark, JCPG's senior vice president of sales and marketing, (Dresen Dep. 50), and Cynthia Barrows, an employee in JCPG's human resource department,[2] held an "employees only" meeting to introduce Barrows and to discuss the employee handbook, including JCPG's sexual harassment policy. (PPFOF ¶ 12; DPFOF ¶ 39; Dresen Dep. 49-54.)  The employees were told that supervisory employees would not be present at the meetings so employees would feel more free to openly discuss work issues.  (DPFOF ¶ 39.)  During the meeting, Dresen and Barrows encouraged the employees to report any problems to their supervisor, any human resources representative, or the president of the company. (DPFOF ¶ 39; Dresen Dep. 69.)

---

[2]Barrows served as an administrative assistant/human resources coordinator for JCPG from 1996 to 2000 and JCPG's Southeastern Wisconsin Home Office Manager from 2000 to 2002, and has served as JCPG's Human Resource Supervisor for Southern Wisconsin from 2002 to the present.  (PPFOF ¶ 6.) Barrows has been known by her first married name of Kalajian, then by her maiden name of Peters, and then by her current married name of Barrows.  (PPFOF ¶ 6.)

After the meeting, Bombaci returned to her work duties. (DPFOF ¶ 42.) While she was stacking newspapers near the jogging table, Wampner grabbed her shirt and started looking down the front of her shirt. (*Id.*) Stoll saw Wampner and yelled at him to stop and told him that his behavior was disgusting. (*Id.*) Bombaci told Stoll that she could not take Wampner and Mueller's treatment of her anymore. (DPFOF ¶ 43.) Stoll suggested that Bombaci report the inappropriate conduct to human resources. (*Id.*) Stoll told Bombaci that she would go with her for support. (*Id.*) Stoll told Bombaci that the guys better not get fired. (Bombaci Dep. 200.) Bombaci and Stoll met with Barrows later that day to report Wampner's and Mueller's misconduct. (DPFOF ¶ 47.) Stoll did most of the talking. (DPFOF ¶ 47; Bombaci Dep. 192.) Stoll told Barrows that the conduct had been going on for four years, (DPFOF ¶ 47; Bombaci Dep. 201), and said that "she didn't want the guys fi- -- well, she said we didn't want the guys fired, that we just wanted them to get, like, whatever – talked to." (Bombaci Dep. 193.) Neither Stoll nor Bombaci identified Wampner or Mueller by name. (Bombaci Dep. 201.) Barrows told Stoll and Bombaci not to talk to each other. (Bombaci Dep. 242.)

After the meeting with Barrows, however, Stoll told Bombaci not to "say anything. She didn't want the guys to get fired. She was calling me a fucking bitch. She told me, I hope you're happy." (Bombaci Dep. 243.) That night, Stoll called Bombaci a "fucking bitch" and told Bombaci that she should not identify Wampner or Mueller. (Bombaci Dep. 242.)

Following the meeting, Barrows discussed the allegations with Jasiek and her supervisor, Dresen. (PPFOF ¶ 13.) Jasiek and Dresen decided that Barrows should begin an investigation into those allegations. (*Id.*) Barrows was the primary investigator with respect to Bombaci's sexual harassment complaint. (Barrows Dep. 83.) Barrows interviewed various JCPG employees between March 27, 2001, and April 6, 2001, and kept notes of the interviews. (PPFOF ¶ 13.) Bombaci was on vacation from March 28, 2001, until April 5, 2001. (DPFOF ¶ 49.) During Bombaci's absence, Barrows and Jasiek met with Stoll to obtain information regarding Bombaci and Stoll's allegations. (*Id.*) Stoll refused to identify the two men who were engaging in inappropriate behavior and reiterated that she did not want them to lose their jobs. (*Id.*) Barrows and Jasiek met with Bombaci on April 5, 2006, when she returned to work. (DPFOF ¶ 50.) Bombaci told Barrows and Jasiek that Wampner and Mueller were the harassers. (*Id.*) Bombaci described Wampner and Mueller's inappropriate sexual conduct. (*Id.*) Bombaci stated that she feared Stoll would retaliate against her. (*Id.*) On April 6, 2001, Barrows and Jasiek met with Hansen who provided specific examples of Wampner and Mueller's inappropriate sexual conduct toward Bombaci and others. (DPFOF ¶ 52.)

On April 6, 2001, Dresen, Jasiek, Barrows, and Creasey met with Wampner, Mueller, Stoll, and Bombaci, individually. (DPFOF ¶¶ 53-55; Dresen Dep. 43-45.) Wampner admitted that he recently pulled on a female employee's shirt but denied that he had any intention of touching the co-worker. (DPFOF ¶ 53.) Mueller acknowledged swearing and commenting on clothing during work hours. (*Id.*)

Dresen decided to suspend Wampner and Mueller with pay pending a decision on their employment status. (Dresen Dep. 43-44.) Jasiek, Barrows, and Creasey agreed with the decision to suspend Wampner and Mueller. (Dresen Dep. 43.)

On April 6, 2001, Dresen, Jasiek, Barrows, and Creasey met with Stoll and informed her that the situation involving Wampner and Mueller was resolved. (DPFOF ¶ 54.) They told Stoll that there was to be no retaliation and instructed her not to discuss the situation with anyone. (*Id.*) During the meeting, Stoll told the group that they handled the situation poorly by holding the meeting in Jasiek's office "right out in the open." (Stoll Dep. 88-89.) Stoll stated, "If you think there is one person not talking about this, you're wrong." (Creasey Dep. 143.) Stoll raised her voice, threw up her hands, decided to leave, and intentionally slammed the door. (Dresen Dep. 164-65; Creasey Dep. 142-44.)

On April 6, 2001, Dresen, Jasiek, Barrows, and Creasey met with Bombaci and informed her that the situation involving Wampner and Mueller was resolved. (DPFOF ¶ 55.) Bombaci cried and stated that she had caused the entire problem. (*Id.*) Dresen told Bombaci that she had done the right thing by reporting the activity. (*Id.*) Bombaci stated that she was already feeling the repercussions from Stoll. (*Id.*) Dresen told Bombaci that JCPG does not tolerate retaliation of any kind and to call Barrows, Creasey, or herself if she experienced any retaliation. (*Id.*) Bombaci was given Creasey's, Barrow's, and Dresen's home telephone numbers. (*Id.*) Dresen told Bombaci not to discuss the situation with anyone. (*Id.*) Bombaci states that Jaisek told her that she did the right thing and that everything would be okay.

(Bombaci Dep. 213, 233.)  Bombaci states that Creasey told Bombaci, "[D]on't worry about it.  Things will get better.  It's going to be hard for a little while, but things will get better."  (Bombaci Dep. 213-14.)

Dresen decided to terminate Mueller and Wampner on April 12, 2001, (Dresen Dep. 18), and both men were terminated on the same day.  (Dresen Dep. 15-16.)[3] Jasiek, Barrows, and Creasey agreed that termination was appropriate.  (Dresen Dep. 46.)  Mueller and Wampner were given the option to resign or be terminated. (Dresen Dep. 17.)  Mueller and Wampner both chose to be terminated.  (Dresen Dep. 18.)  Dresen was the primary decision-maker with respect to their dismissals. (Dresen Dep. 16.)  Dresen states that Wampner and Mueller were terminated for "inappropriate behavior in the workplace."  (Dresen Dep. 20.)  Specifically, Mueller admitted that he uttered foul language, inappropriate innuendos, and jokes, all of a sexual nature.  (Dresen Dep. 23-24.)  Wampner admitted that he touched Bombaci's clothing.  (Dresen Dep. 25-27.)  In addition, two other incidents led to Wampner's dismissal: the January 2001 incident in which he threw a paper cup that hit Bombaci in the face and the February 2001 incident  in which he used profane language. (Dresen Dep. 26.)  According to Dresen, Wampner and Mueller both admitted that they placed broom sticks between their legs to simulate an erect penis.  (Dresen Dep. 39-42.)  Dresen states that both Wampner and Mueller violated JCPG's sexual harassment policy.  (Dresen Dep. 38.)

---

[3]Dresen also states that she made the decision to terminate Wampner and Mueller sometime between April 9-11, 2001.  (Dresen Dep. 137.)

When Wampner and Mueller were terminated and left the Hartland facility, Stoll told Bombaci, "I hope you're glad, you fucking bitch. You got these guys fired. She goes, you weren't supposed to tell the names." (Bombaci Dep. 243-44.) After Wampner and Mueller were discharged, Bombaci was not subjected to any inappropriate sexual conduct. (DPFOF ¶ 58.)

Before March 27, 2001, Bombaci did not report Wampner and Mueller's misconduct to Creasey, Jasiek, or any human resources personnel.[4] (Bombaci Dep. 188, 198.) Bombaci states that she did not report Wampner and Mueller's conduct to Creasey because Creasey was friends with Wampner and Mueller, (Bombaci Dep. 135-37), and because Stoll told her not to report to Creasey. (Bombaci Dep. 141-42, 148, 155-56.) At her deposition, Bombaci stated that she feared Stoll would treat her poorly if she reported to Creasey. (Bombaci Dep. 148, Mar. 3, 2005.) At a hearing before the Equal Rights Division of the State of Wisconsin Department of Workforce Development, Bombaci stated that she feared more harassment from Wampner if she reported to Creasey. (DPFOF Ex. 3 at 93-94; Nov. 20, 2002.) Bombaci states that she did not report to Jasiek because "I didn't know [him] – I knew that he was in the front office. I didn't know he was management." (Bombaci Dep. 135.) Bombaci states that she did not report to anyone in human resources because "[w]e didn't have one." (Bombaci Dep. 134.) When asked who was responsible for human resources matters at the Heartland facility before Barrows

---

[4]Bombaci did not report any misconduct with the exception of telling Creasey that Wampner hit her with the paper cup. (Creasey Dep. 50.)

Case 2:04-cv-00326-JPS   Filed 03/28/06   Page 11 of 37   Document 47

assumed that responsibility, Dresen said, "We don't have – there's no one that is HR out in the field other than – Cindy's unique." (Dresen Dep. 113-14.) Aside from these explanations, Bombaci struggled at other points during her deposition when she was asked why she had not reported Wampner and Mueller's conduct to management:

> Q. Why [did you grin and bear the harassment]?
>
> A. I don't know why. I had liked my job.
>
> Q. If you believed that the inappropriate behavior wasn't stopping early on, why didn't you go to anyone else [aside from Stoll]?
>
> A. I don't know. I couldn't tell you. I don't know. I didn't know I could. I didn't trust anybody by that time.
>
> Q. Why didn't you go to the police?
>
> A. I couldn't tell you. I thought this is what goes on. Maybe I should have.
>
> Q. Is that the only reason why you didn't go to Mr. Creasey or anyone else in the company to let them know?
>
> A. I just thought I had to deal with it because that's what [Stoll] told me to do, deal with it. And I like my job. I wanted to be somebody. It was my first good job. I had my own benefits. I could retire good, had the insurance.

(Bombaci Dep. 142-43.) Bombaci struggled moments later:

> Q. Why didn't you tell anyone in the company [that Wampner pulled on your shirt]?
>
> A. Because I was stupid.
>
> Q. Any other reason?
>
> A. I didn't know how to.

Case 2:04-cv-00326-JPS   Filed 03/28/06   Page 12 of 37   Document 47

Q.    Did you look in the employee handbook to see if there was any direction on where you can go?

A.    No.

Q.    Why?

A.    I don't know why.

(Bombaci Dep. 146.) JCPG's sexual harassment policy is distributed to employees at the beginning of their employment. (DPFOF ¶ 14.) The policy states, among other things, the following:

> If you believe that you have been harassed you are encouraged to come forward without fear or reprisal by:
>
> *Telling your supervisor/manager; or
> *Telling a supervisor/manager not in your work area; or
> *Telling the human resource manager; at 715-258-8450 ext. 118; or
> *Telling the president of Add Inc. at 715-258-9447

(DPFOF ¶ 15.) Bombaci states that she received an employee handbook, (Bombaci Dep. 61); she read some of it, (Bombaci Dep. 67); but she did not read the sexual harassment policy. (Bombaci Dep. 68-69.) JCPG also provides sexual harassment training during new employee orientation; the employee is required to watch a video that describes sexual harassment and that identifies who receives reports of harassment. (DPFOF ¶ 20.) Bombaci viewed the sexual harassment training video. (DPFOF ¶ 36.) Bombaci signed a form, dated August 24, 1998, that indicates that she received and read the employee handbook and watched the sexual harassment video and understood them both. (DPFOF ¶ 37, Ex. 7.)

Creasey states that he did not have independent knowledge of Wampner and Mueller harassing Bombaci. (DPFOF Ex. 3 at 64.) Creasey states that no employee reported any sexual comments to him during Bombaci's employment. (Creasey Dep. 27.) When asked about several alleged incidents of Wampner harassing Bombaci, Creasey stated that he was not aware of the incidents. (Creasey Dep. 133-34.) Bombaci does not remember Creasey ever observing the alleged harassment. (Bombaci Dep. 30.) Hansen states that he never observed that Creasey was present when Wampner and Mueller made any sexual comment. (Hansen Dep. 37-38.) Bombaci states that many of the incidents of harassment occurred very near Creasey's office. (Bombaci Dep. 30, 32.) Creasey's office was located approximately 30 feet from the closest press area. (DPFOF ¶ 68.) Creasey's desk faced away from the window. (DPFOF ¶ 68; Hansen Dep. 40; Bombaci Dep. 87-88.) The press that Wampner and Mueller worked on was not visible from Creasey's office. (Hansen Dep. 109.) Creasey usually kept the door to his office closed. (Zilisch Dep. 35.) When the presses were running it was difficult to hear someone ten feet away unless the speaker was yelling. (DPFOF ¶ 67.) Most of the alleged misconduct occurred while the presses were running. (DPFOF ¶ 66.) Mueller states that he cannot say whether Creasey observed any "horseplay" or "tomfoolery" because "[y]ou try not to do that in front of the bosses." (Mueller Dep. 106.) In 1996, before Bombaci's employment with JCPG, Creasey overheard Mueller state, "I like this new refrigerator because now they have to bend over to look for their food," and Creasey reported Mueller to Jasiek. (DPFOF ¶ 65; Creasey

Dep. 25.)  Mueller received a written warning for making the comment.  (DPFOF ¶ 65; Creasey Dep. 25.)

Hansen states that he encouraged Bombaci to report Wampner and Mueller's misconduct to management approximately six times beginning about one year before Wampner and Mueller were terminated.  (DPFOF ¶ 45; Hansen Dep. 36, 54-55.)  Hansen states, "I told her if she was upset that she should report it to Jim or Gary.  And if she didn't want to, I would go up there with her."  (DPFOF ¶ 45; Hansen Dep. 36.)  According to Hansen, Bombaci responded that "she didn't want those two fired," (DPFOF ¶ 45; Hansen Dep. 37), and that "people wouldn't talk to her." (DPFOF ¶ 45; Hansen Dep. 107.)  Stoll states that she suggested to Bombaci that Bombaci report Wampner and Mueller's misconduct to Creasey but that Bombaci did not follow her advice.  (DPFOF ¶ 45; Stoll Dep. 130.)

Although Bombaci acknowledges that Creasey was her supervisor, (DPFOF ¶ 26; Bombaci Dep. 54), she states that she reported the harassment to Stoll whom she also believed to be her supervisor.  (Bombaci Dep. 73-74.)  Bombaci states that she believed Stoll to be her supervisor "[b]ecause I was told to go to her with anything, where I needed to go for my jobs, what my jobs were supposed to be.  If I would call in sick or whatever, if Jim was not there, Sarah took over.  Time off, vacation time, we had to go through Sarah.  That's it."  (Bombaci Dep. 74.) Throughout Bombaci's employment, Bombaci worked with Stoll, the longest tenured jogger at JCPG.  (DPFOF ¶ 25.)  Stoll began her employment as a jogger in August 1993.  (*Id.*)  On her first day of employment, Creasey told Bombaci to report to Stoll

who would show Bombaci how to perform her job duties.  (DPFOF ¶ 27.)  Bombaci trained under Stoll for approximately one week.  (*Id.*)  Stoll continued to give Bombaci instructions about how to perform her duties throughout Bombaci's employment.  (PPFOF ¶ 86.)

Aside from performing the job duties of a jogger, Stoll had additional responsibilities.  Stoll: (1) added up numbers on waste management reports submitted by press operators and entered the numbers in a computer located in Creasey's office, which took Stoll approximately an hour a day to perform; (2) reviewed the joggers' and press operators' time sheets to make sure that they punched or recorded their start and finish time, informed them when a time entry was missing, and provided the information to Barrows, which took Stoll approximately one hour a week to perform; (3) reminded Creasey if he needed jogger coverage for the weekend; (4) distributed paychecks to the joggers and press operators when Creasey was absent, which took Stoll approximately fifteen minutes to perform and which she performed about two to three times per year; and (5) helped joggers with how to perform their work.  (DPFOF ¶ 30; Creasey Dep. 87-92.) Stoll also helped Creasey keep track of vacation and personal days by recording vacation requests on a calendar located in Creasey's office, but Creasey approved all such requests.  (DPFOF ¶ 31.)  When Creasey was not at the Hartland facility, Bombaci was told to go to Stoll to obtain her work assignment for the day as well as to report any time off.  (*Id.*)  Bombaci and others also testified that Stoll tells the other joggers what part of the press the joggers should work on.  (Stoll Dep. 16-17;

Mueller Dep. 26-27; Wampner Dep. 25-26.)  Despite the additional job duties that Stoll performed, Stoll did not have authority or input regarding hiring, firing, setting wages, disciplining, approving and scheduling vacation and leaves of absence. (DPFOF ¶ 34.)

Bombaci communicated her belief that Stoll was a supervisor after the March 27, 2001, "employees only" meeting.  Bombaci asked Barrows why Stoll was at the meeting since no supervisors were permitted.  (DPFOF ¶ 40; Barrows Dep. 159.) Barrows was surprised to hear Bombaci refer to Stoll as a supervisor since she was a jogger like Bombaci.  (DPFOF ¶ 40.)  Barrows told Bombaci that Stoll was not a supervisor.  (*Id.*)  After conducting an investigation, Barrows concluded that Stoll was not a supervisor.  (*Id.*)  Dresen and Barrows do not doubt that Bombaci was convinced that Stoll was a supervisor.  (PPFOF ¶ 85.)  Wampner and Mueller both referred to Stoll as the "head jogger," (Mueller Dep. 26; Wampner Dep. 25), and Mueller testified that Bombaci reported to Stoll.  (Mueller Dep. 28.)  Regarding the investigation, Creasey testified that "through the investigation, it came out that some people thought [Stoll] had supervisory duties."  (Creasey Dep. 95.)

On July 30, 2001, four months after Barrows conducted an investigation into Stoll's supervisory status, Creasey issued the following memorandum to "Printing Staff":

> I would like to clear up any questions or concerns some of you may have over what exactly Sarah Stoll's duties are.  We will be having an informal meeting in the pressroom on Tuesday at 9:00 a.m. to discuss this matter and anything else you would like to discuss.  Cindy Kalajian, SE WI Human Resource [sic] Manager will be joining us for this meeting.

Sarah is not in charge of, or supervisor for, the Web press Joggers. However, in the past she has and will continue to help me with scheduling them.

Over the years Add Inc. has increased the amount of reports that all the printing plants are required to do. I have enlisted Sarah's help in getting these weekly and monthly reports completed. Unfortunately, this makes it impossible for her to always be available to jog on the press.

This past year with the addition of the CNI papers I have been asking Sarah to help in the plate department every Wednesday, in order to reduce the press down time between runs, and to help out when John or Romy are on vacation. This also takes away time from her jogging schedule.

(PPFOF ¶ 89.)

After Wampner and Mueller were fired, Bombaci states that she suffered retaliation from co-workers. Specifically, Bombaci states that she was isolated by co-workers. (Bombaci Dep. 280.) Bombaci states that many of her co-workers would not eat lunch with her and would not converse with her during smoking breaks. (Bombaci Dep. 259.) Bombaci states that Stoll assigned her to bad jobs, including emptying bins by herself, sweeping by herself, taking papers out to the newspaper truck, and scrubbing down the press. (Bombaci Dep. 283.) Bombaci states that Stoll put her on bad jobs at various times throughout Bombaci's employment, including at the very beginning of Bombaci's employment. (Bombaci Dep. 282.) Bombaci states that taking out the trash, clearing out the paper bins, and sweeping the floor were part of the job responsibilities of a jogger. (Bombaci Dep. 281.)

In August 2001, Bombaci told Barrows that she felt isolated and that Stoll was giving her bad jobs. (Barrows Dep. 29, 56.) Barrows states that she asked Creasey to investigate Bombaci's allegations, and Creasey told Barrows that he did not observe any change in Bombaci's work assignments. (Barrows Dep. 56-58.) Barrows states that she observed Bombaci eating lunch and having smoking breaks with others. (Barrows Dep. 228-29.)

On September 27, 2001, Bombaci faxed a letter of resignation to JCPG. (DPFOF ¶ 96.) Bombaci's last day of work was September 21, 2001. (*Id.*)

## ANALYSIS

### I. MOTION TO STRIKE

In JCPG's reply brief in support of summary judgment and throughout its responses to the plaintiff's statement of material facts, JCPG moves to strike the EEOC investigator's interview notes as inadmissible hearsay. (Def.'s Reply Br. Summ. J. 4-5; Def.'s Resp. Pl.'s Statement of Material Facts ¶¶ 40, 50, 58, 87-88, 96-98, 108, 126-127, 138.)

Litigants in other districts within this circuit have faced conflicting instructions regarding whether to file motions to strike as separate motions or as a part of the motion for summary judgment. *Compare O'Brien v. J. Sterling Morton High School District 201*, 2004 WL 2222275, at *3 (N.D. Ill. Sept. 30, 2004) (Coar, J.) ("As an initial matter, the Court notes its displeasure at parties filing motions to strike in reply briefs, without failing to notice a specific motion."), *with Yonehara v. American Airlines, Inc.*, 2004 WL 2222184, at *7 (N.D. Ill. Sept. 30, 2004) (Coar, J.) ("Before

Case 2:04-cv-00326-JPS   Filed 03/28/06   Page 19 of 37   Document 47

the Court can address Defendant's motion for summary judgment, it must address Plaintiff's motion to strike, which appropriately, was not filed as a separate noticed motion, but addressed within his response to American's motion for summary judgment."), *and Sphere Drake Ins. Ltd. v. All American Life Ins. Co.*, 300 F. Supp. 2d 606, 613 (N.D. Ill. 2003) ("[T]his bench looks with disfavor on separate motions to strike and expects a party to incorporate any evidentiary objections in either its summary judgment brief or a Local Rule 56.1 statement."); *see also Trustmark Ins. Co. (Mut.) v. Schuman*, 2004 WL 1622094, at *12 n.9 (S.D. Ind. Jun. 8, 2004) (noting conflicting instructions in the local rules). The local rules in this district do not provide any specific guidance with respect to motions to strike. Civil Local Rule 7.1(a) states that "[e]very motion must set forth the rule pursuant to which it is made" and must be accompanied by a supporting brief. JCPG did not file a separate supporting brief in support of its motion to strike but devoted a portion of its reply brief in support of summary judgment to the issue. (Def.'s Reply Br. Summ. J. 4-5.) JCPG states that the interview notes must be stricken as inadmissible hearsay under Federal Rule of Evidence 802. (Def.'s Reply Br. Summ. J. 4.) Because JCPG's motion to strike complies with the letter of Civil L.R. 7.1(a), the court will not deny the motion "as a matter of course." Civil L.R. 7.1(a).

Bombaci[5] makes no response to JCPG's argument that the EEOC investigator's interview notes should be stricken as inadmissible hearsay. In some respect, the lack of response is understandable because the local rules do not

---

[5]The court refers to the EEOC and Bombaci, collectively, as "Bombaci."

explicitly provide for sur-reply briefs or replies to proposed findings of fact. Bombaci, however, could have filed a separate response to JCPG's motion to strike or sought leave to file a sur-reply brief. The court is not required to research and advance arguments on behalf of a party that remains silent, especially where that party is represented by counsel. *See United States v. Smith*, 26 F.3d 739, 743 (7th Cir. 1994) ("It is not the obligation of this court to research and construct the legal arguments open to the parties, especially when they are represented by counsel.") (citation omitted). In the absence of any response to JCPG's motion to strike, the court will grant JCPG's motion and disregard the EEOC investigator's notes. *See Tulloss v. Near North Montessori School, Inc.*, 776 F.2d 150, 154 (7th Cir. 1985) (stating that a district court should determine on a case-by-case basis what, if any, EEOC investigative materials should be admitted at trial).

## II.    SUMMARY JUDGMENT

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 256-57. A party opposing

summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255 (1986).

### A.    Sexual Harassment

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. There are several ways to frame a Title VII claim, including a claim of a "hostile work environment." *Cooper-Schut v. Visteon Automotive Systems*, 361 F.3d 421, 426 (7th Cir. 2004).

An plaintiff alleging a hostile work environment based upon a co-worker's sexual harassment must show: (1) she was subject to unwelcome harassment; (2) the harassment was based upon sex; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. *See Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 677 (7th Cir. 2005).

There are genuine issues of material fact that Bombaci was subject to harassment that was unwelcome, based upon sex, and severe or pervasive. A hostile work environment is one that is both objectively and subjectively offensive. *Faragher*, 524 U.S. at 787. In evaluating the objective offensiveness of a plaintiff's work environment, the court considers all of the circumstances, including the

"frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (internal citation omitted); *Baskerville v. Culligan Intern. Co.,* 50 F.3d 428, 430-31 (7th Cir. 1995) (contrasting deeply harassing conduct, such as sexual assaults, physical contact for which there is no consent, uninvited sexual solicitations, intimidating words or acts, obscene language or gestures, and pornographic pictures with merely vulgar and mildly offensive conduct, such as occasional vulgar banter, tinged with sexual innuendo, of coarse, boorish workers).

Bombaci and other witnesses describe some forms of harassment that are severe, such as groping Bombaci's breasts, pulling Bombaci's shirt down, and other instances of physical contact. Bombaci and other witnesses describe other forms of harassment that are pervasive, such as the frequent sexual teasing directed at Bombaci. Much of the harassment was clearly of a sexual nature, and a reasonable jury could find that Wampner and Mueller were motivated by gender and harassed Bombaci because she is a woman. *See Heuer v. Weil-McLain*, 203 F.3d 1021, 1024 (7th Cir. 2000) (stating that the hostile work environment is actionable where the hostility is motivated by gender). Considering all of the incidents of harassment as a whole, a reasonable jury could believe the accounts of these witnesses and find

that the harassment was severe or pervasive and based on sex. Bombaci and others state that Bombaci objected many times to the harassing conduct. A reasonable jury could find that the harassment was unwelcome.

Bombaci, however, has not demonstrated a basis for employer liability. With respect to employer liability, employers are strictly liable for harassment inflicted by supervisors, subject to an affirmative defense when the harassment does not involve a tangible employment action. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). When a plaintiff claims that co-workers alone created the hostile working environment, she must show that her employer has been "negligent either in discovering or remedying the harassment." *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998) (citing *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)). An employer must take reasonable steps to discover and rectify acts of sexual harassment by its employees. *Parkins*, 163 F.3d at 1032, 1035. In this case, Bombaci alleges that co-workers alone sexually harassed her.

Bombaci does not contend that JCPG was negligent in remedying the harassment after she reported the harassment on March 27, 2001. (*See* DPFOF ¶ 51.) Rather, Bombaci argues that JCPG was negligent in discovering that Wampner and Mueller harassed her. Bombaci concedes that she did not report the harassment to any member of management prior to March 27, 2001.[6] (Bombaci

---

[6]Bombaci argues that she reported the harassment to Stoll who acted as her supervisor, but as the court will explain, Stoll is not a supervisor and her knowledge of the harassment does not put JCPG on notice of the harassment.

Case 2:04-cv-00326-JPS   Filed 03/28/06   Page 24 of 37   Document 47

Dep. 188, 198.) Despite her failure to report the harassment, Bombaci contends that JCPG supervisors Creasey, Hagen, Zilisch, and Barrows had actual knowledge of Wampner and Mueller's harassment of Bombaci. *See Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1014 (7th Cir. 1997) (analyzing whether an employer had a reason to know of the harassment on its own where the employee did not report the harassment). Bombaci also argues that her co-worker Stoll had actual knowledge of the Wampner and Mueller's harassment. Finally, Bombaci contends that JCPG had constructive notice of the harassment because the harassment was public, occurring outside of Creasey's office.

### 1.    Creasey's Knowledge

Bombaci alleges that Creasey was aware of "the harassment" for years before Bombaci complained to Barrows on March 27, 2001. (Pls.' Br. 6-7.) Bombaci contends that a number of incidents put Creasey on notice of Wampner and Mueller's harassment. (*Id.*) None of the incidents cited by Bombaci, however, concern the many forms of sexual harassment that were directed at Bombaci.

For example, Bombaci contends that the following incidents put Creasey on notice of Wampner and Mueller's ongoing harassment: (1) in 1996, Mueller saw a female employee (not Bombaci) bend over the refrigerator in JCPG's breakroom and said, "I like this new refrigerator because now they have to bend over to look for their food"; (2) in 1998, a female employee (not Bombaci) complained that Wampner and Mueller were engaging in offensive name calling and comments; (3) in a January 5, 1999, performance evaluation, Creasey rated Wampner "unsatisfactory" for "attitude"

and "negative effect on coworkers"; (4) Wampner and Mueller adhered photographs of women in bikini swimsuits on the web press that they operated, and Creasey removed the photographs; (5) Creasey heard JCPG employees tell sexual jokes in the Press Room; (6) in January 2001, Wampner threw a crushed paper cup and hit Bombaci; (7) in February 2001, Wampner yelled profanities at co-workers (none of whom were Bombaci); and (8) in February 2001, Creasey asked Stoll why she and Bombaci rarely ever worked with Wampner and Mueller and Stoll replied, "those guys are really bad the way they talk."  (*Id.*)

Most of these incidents, including the 1996 comment, the photographs, and the February 2001 profanity-laced tirade, had little effect on Bombaci's work environment because Bombaci was not present when they occurred and had no knowledge of them.  *See Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005) (stating that "second-hand harassment," such as comments that did not involve the plaintiff and that the plaintiff didn't hear, is relevant but less objectionable than harassment directed at the plaintiff); *Cooper-Schut*, 361 F.3d at 429 ("Cooper-Shut never claimed to have seen the graffiti or to have complained about it to Visteon, so even if it were accepted unconditionally, this evidence does not go to show that Visteon was negligent in responding to Cooper-Schut's problems.").  Specifically, the 1996 comment occurred before Bombaci was hired; Bombaci does not contend that she saw the photographs of women in bikinis; and Bombaci does not contend that she heard Wampner yell profanities at co-workers in February 2001.  Many of the incidents do not involve harassment based upon sex

or motivated by gender. Specifically, Bombaci does not allege that the name-calling directed at a co-worker in 1998 or the profanities directed at co-workers in February 2001 were based on sex, and the January 5, 1999, performance evaluation does not indicate that Wampner engaged in sexual harassment.

The only incidents that directly involve Bombaci involve the paper cup and Stoll's comment that "those guys are really bad the way they talk." With respect to the incident involving the paper cup, Bombaci concedes that the misconduct was not a form of sexual harassment. (*See* DPFOF ¶ 46.) Moreover, Bombaci reported the incident to Creasey, and Creasey disciplined Wampner by issuing a written warning to him for his misconduct. (*Id.*) With respect to Stoll's comment, Stoll did not provide Creasey with any details or examples of the comments. (DPFOF ¶ 62.) Importantly, Creasey investigated the matter by interviewing Bombaci directly, but Bombaci refused to provide any information and commented that nothing was going on. (*Id.*) Neither Stoll nor Bombaci gave Creasey "enough information to make a reasonable employer think there was some probability that she was being sexually [or racially] harassed." *Zimmerman v. Cook County Sheriff's Dept.*, 96 F.3d 1017, 1019 (7th Cir. 1996); *see Cooper-Schut*, 361 F.3d at 426-27 (although plaintiff reported conflict with co-workers, employer did not have reason to believe that the conflicts involved race or sex discrimination). Creasey's investigation of Stoll's comment was a reasonable response and was not negligent. *See Cooper-Schut*, 361 F.3d at 427 (stating that interviewing the employees involved was a reasonable response). After Stoll and Bombaci denied that there was a problem, there was

nothing more to investigate because there were no complainants, and Creasey had no other reason to believe that sexual harassment occurred. *See Perry*, 126 F.3d at 1014-15 (finding that the "reasonableness" of an employer's response to a complaint of harassment may be affected by the cooperation, or lack thereof, by the complaining employee).

None of the incidents that Bombaci cites could have put Creasey on notice of the sexual harassment that Wampner and Mueller directed at Bombaci, and Bombaci does not offer any other basis to believe that Creasey had actual knowledge of Wampner and Mueller's sexual harassment of Bombaci.

## 2. Hagen, Zilisch, and Barrow's Knowledge

Bombaci contends that Inserting Mail Manager Crystal Hagen[7] knew that Wampner and Mueller harassed Bombaci but failed to report the harassment. (Plaintiffs' Brief 7-8, 17-18; PPFOF ¶ 67.) In support of her claim, Bombaci cites the EEOC investigator's notes. (*See* PPFOF ¶ 67.) The investigator wrote, "Hagen at first stated that she saw that the Charging Party was subjected to sexual harassment by Brian and Glenn. She stated it was mainly the two men talking about the CP's rear end and body. However, minutes later Hagen stated that she never saw the CP actually being harassed by any one during her employment." (Van Thiel Aff. Attach. 7 at ¶ 2.)

---

[7]Hagen worked full-time at JCPG from December 2, 1995-October 16, 2000, and again part-time for a few months in 2001. From December 3, 1999-October 16, 2000, she served as Inserting Mail Manager. (PPFOF ¶ 66.)

The EEOC investigator's notes do not create a genuine issue of material fact that JCPG knew that Wampner and Mueller sexually harassed Bombaci. As an initial matter, Bombaci does not contest that the investigator's notes are inadmissible hearsay that the court should not consider in ruling upon JCPG's summary judgment motion. Additionally, Hagen testified at her deposition that she never heard Wampner and Mueller make inappropriate remarks of a sexual nature, (Hagen Dep. 36:8-13, Jan. 18, 2005); contrary to the interview notes, she states that she never saw Wampner or Mueller sexually harass Bombaci, (Hagen Dep. 37:22-38:1-3); and she never saw Bombaci harassed by anyone. (Hagen Dep. 38:22-25-39:1.) Even if the investigator's notes were admissible and accurate, however, they do not demonstrate that Hagen heard the remarks about Bombaci's "rear end and body" when Hagen was a supervisor. If Hagen were not a supervisor, Bombaci does not explain why her knowledge of any harassment should be imputed to JCPG. *See Young v. Bayer Corp.*, 123 F.3d 672, 672-73 (7th Cir. 1997) (discussing "the lowest level in a corporate or other institutional hierarchy at which notice to an employee of sexual harassment is deemed notice the employer"); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992) (stating that the knowledge of an agent is imputed to her corporate principal only if the agent receives the knowledge while acting within the scope of her authority and has a duty to speak to the principal about the specific item of knowledge). The notes also do not indicate that the alleged comments were overheard by Bombaci or any other employee. In other words, the notes do not indicate whether the comments were a form of verbal

harassment or whether they were part of a crass, but private, conversation. In sum, Bombaci has not demonstrated that Hagen knew that Wampner and Mueller sexually harassed Bombaci.

Bombaci contends that Shipping Supervisor Kenneth Zilisch was hit in the groin by Wampner but failed to report the harassment. (Pls.' Br. 8, 17-18.) This argument does not demonstrate that Zilisch had any knowledge of Wampner and Mueller's harassment of Bombaci. Additionally, although some documents referred to Zilisch as a "supervisor" or "manager," (PPFOF ¶ 76), Jasiak and Zilisch himself testified that Zilisch has never been a manager or supervisor. (Jasiek Dep. 17; Zilisch Dep. 14, 22.) Zilisch only had the title of supervisor so that he could receive a mid-year salary increase. (Jasiek Dep. 17.) There is no genuine issue of material fact that Zilisch was a supervisor, and in any event, Bombaci has not demonstrated that Zilisch knew that Wampner and Mueller sexually harassed Bombaci.

Bombaci contends that Human Resources supervisor Cynthia Barrows knew of Wampner's propensity to "get out of line" and that Wampner called Barrows a "bitch" in early 2001 but failed to discipline Wampner. (Pls.' Br. 8, 18.) This argument does not demonstrate that Barrows had any knowledge of Wampner and Mueller's harassment of Bombaci. Bombaci does not contend that this incident affected the terms and conditions of her employment. (*See* PPFOF ¶ 82.)

### 3. Stoll's Knowledge

Bombaci contends that Stoll knew that Wampner and Mueller harassed Bombaci because Stoll witnessed the harassment and Bombaci reported the

harassment to Stoll. Bombaci argues that she had a reasonable expectation that Stoll would "follow through" and report the harassment because Stoll acted as one of Bombaci's supervisors by training her and giving her instructions throughout her employment. (Pls.' Br. 8-9, 18.) Stoll also told Bombaci that she made Creasey aware of the harassment. (*Id.*)

In determining whether the plaintiff placed her complaint in a proper channel, the court considers: (1) who has the authority to terminate the harassment of which the plaintiff is complaining; and (2) did the plaintiff complain to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it. *Young*, 123 F.3d at 675. Although Stoll trained Bombaci, gave her instructions, and may have given her daily work assignments, Bombaci does not contend that Stoll had the actual authority to receive or respond to complaints of sexual harassment, to address grievances, or to terminate or discipline the alleged harassers. (*See* PPFOF ¶ 88.) Bombaci does not contend that Stoll had the actual authority to hire, fire, demote, promote, or discipline anyone, including the harassers. (*Id.*)

Bombaci's expectation that Stoll would refer a complaint of harassment to Creasey is not reasonable. Bombaci does not contend that any jogger or press operator ever relayed complaints of harassment, or grievances in general, to Creasey through Stoll. Stoll may have "acted as Bombaci's supervisor," (Pls.' Br. 18), by telling Bombaci how to do her job, but Stoll did not act as a supervisor by receiving employment grievances from other joggers and relaying them to members

of JCPG management. When Wampner hit Bombaci with a paper cup, Bombaci did not relay her grievance through Stoll but instead reported the incident directly to Creasey. Bombaci does not contend that she asked Stoll to report the harassment or that reporting the harassment was one of Stoll's actual job responsibilities. Bombaci considered Creasey to be her boss. If she intended to report the sexual harassment, she could have reported the harassment to Creasey just as she had reported being hit by a paper cup.

Moreover, the record does not demonstrate that Bombaci actually expected or desired Stoll to report any complaint to Creasey. When Stoll told Creasey that "those guys are really bad the way they talk," Creasey asked Bombaci for an explanation and Bombaci refused to provide Creasey with any information. (Creasey Dep. 106-12.) In light of her refusal to talk to Creasey and her denial that there was a problem, Bombaci cannot reasonably contend that she expected Stoll to relay her complaints to Creasey. Hansen and Stoll both state that they suggested to Bombaci that she report the harassment, but Bombaci did not want to report the harassment. (DPFOF ¶ 45; Hansen Dep. 37, 107.) Bombaci also states that she did not want to report the harassment to Creasey directly because she feared retaliation from Stoll and Wampner and because Creasey was friends with the harassers; given this fear of retaliation and perhaps doubt that reporting would be futile, however, Bombaci does not explain why she wished to report the harassment to Creasey through Stoll. Bombaci has not shown that she actually expected Stoll to report any complaint of harassment.

The court also notes that Bombaci knew or should have known how to report the harassment. Bombaci's employee handbook identified persons to whom she could report. Hansen told Bombaci that she should report the harassment to Creasey or Jasiek. Bombaci had reported the paper cup incident to Creasey.

Bombaci states that Creasey was friends with Wampner and Mueller, but an employee does not act reasonably if she assumes that the employer will fail to protect her without allowing the employer a chance to try. *See Cooper-Schut*, 361 F.3d at 429. If Bombaci reported the harassment to Creasey before March 27, 2001, there is no reason to doubt that Creasey would have reported the harassment to Jasiek just as he reported Mueller's 1996 comment or Wampner's January 2001 paper cup incident. *See Baskerville*, 50 F.3d at 432 ("Had Baskerville complained to the human resources department earlier, as she had been instructed to do, there is no reason to doubt that the 'harassment' . . . would have ceased then.").

"The law against sexual harassment is not self-enforcing." *Parkins*, 163 F.3d at 1038; *Perry*, 126 F.3d at 1014. An employee must make a "concerted effort to inform the employer that a problem exists." *Parkins*, 163 F.3d at 1038. "A plaintiff has no duty under the law to complain about discriminatory harassment, but the employer in a case like this one will not be liable if it had no reason to know about it." *Perry*, 126 F.3d at 1014. In this case, JCPG was not put on notice that Wampner and Mueller were harassing Bombaci until Bombaci reported the harassment on March 27, 2001. At that time, JCPG reasonably investigated and remedied the harassment. There is no basis for employer liability.

### 4. Constructive Notice

Bombaci contends that JCPG had constructive notice of the harassment because the harassment was being loudly and brazenly carried out for four or more years outside of Creasey's office. (Pls.' Br. 19-20.) Bombaci does not contend that Creasey ever witnessed Wampner or Mueller harassing her but contends that many instances took place near his office. (Bombaci Dep. 30.)

Notice of sexual harassment may be presumed "where the work environment is permeated with pervasive harassment." *Wilson v. Chrysler Corp.*, 172 F.3d 500, 509 (7th Cir. 1999); *Zimmerman*, 96 F.3d at 1018-19 ("The sheer pervasiveness of the harassment might support an inference that the employer must have known of it."). In *Wilson*, the Seventh Circuit stated, "[I]t is reasonable to conclude that Chrysler had knowledge of at least some acts of harassment," *id.*, because "[t]o hold otherwise, we must believe that every member of Chrysler's management team was oblivious to such openly hostile behavior." *Id.* Bombaci has not shown a genuine issue of material fact that JCPG had constructive notice that Wampner and Mueller harassed her. Although Bombaci claims that many acts of harassment were brazenly carried out near Creasey's office, neither Bombaci nor Hansen recall Creasey ever observing the alleged harassment. (Bombaci Dep. 30; Hansen Dep. 37-38.) In fact, with respect to many of the instances of the alleged harassment, Bombaci states that the only witnesses were Wampner, Mueller, and Stoll. Given the small number of witnesses to a large portion of harassing conduct, Bombaci cannot show that JCPG managers must have known about the harassment. If the

working environment were so permeated with harassment that management must have been aware of it, more co-workers would have witnessed the harassing conduct. Bombaci states that many of the incidents of harassment occurred very near Creasey's office. However, Bombaci does not describe what specific conduct occurred near Creasey's office, whether the presses were running when the conduct occurred, or whether Creasey was in the office when the conduct occurred. The press that Wampner and Mueller worked on was not visible from Creasey's office, and most of the alleged misconduct occurred while the presses were running. Mueller does not recall that Creasey observed any "horseplay" or "tomfoolery" because "[y]ou try not to do that in front of the bosses." (Mueller Dep. 106.) Mueller knew this to be the case because Creasey reported him in 1996 when Creasey overheard Mueller make a sexual comment. Although some of the harassment alleged by Bombaci is severe and some of the harassing comments were frequent, the facts presented do not demonstrate this to be a case where the harassing conduct is so open and notorious that JCPG must have known about it.

## B. Retaliation

EEOC contends that JCPG retaliated against Bombaci for reporting her harassment by isolating and shunning Bombaci, yelling and cursing at her, and assigning her to less desirable and more dangerous work.

To establish a Title VII retaliation claim, a plaintiff must demonstrate that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action by his employer; and (3) a causal link exists between the

protected expression and the adverse action.  *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001).

Bombaci has not shown that she suffered an adverse employment action. Although an adverse employment action may occur when an employer orders its employees to shun the plaintiff, *Parkins*, 163 F.3d at 1039 (citing *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 485 (7th Cir. 1996)), there is no evidence in this case that JCPG ordered any employee to shun Bombaci.  Any ostracism that Bombaci suffered, therefore, did not amount to an adverse employment action.  *Parkins*, 163 F.3d at 1039.  Additionally, the record does not demonstrate that Bombaci was assigned to less desirable and more dangerous work.  In her legal memorandum, Bombaci does not specify the less desirable, more dangerous work.  (Pl.'s Br. Summ. J. 23-25.)  If the less desirable work involves taking out the trash, carrying newspapers, cleaning the presses, and sweeping the floors by herself, (Bombaci Dep. 283),  these tasks were indisputably part of her job responsibilities before and after she reported the harassment.  (See DPFOF ¶¶ 24, 85; Bombaci Dep. 281-82.) Because the terms and conditions of Bombaci's employment did not change, she did not suffer an adverse employment action.  *Krause*, 246 F.3d at 1001 ("[A] materially adverse change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.") (citation omitted).  For the same reasons, Bombaci was not constructively discharged.  *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir.1996) (stating that constructive discharge occurs when an employee's discriminatory working conditions become so intolerable that a

reasonable person in her position would be compelled to resign); *see also EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331-32 (7th Cir. 2002) (stating that a plaintiff must demonstrate a constructive discharge by showing a discriminatory work environment "even more egregious than the high standard for hostile work environment") (citation omitted); *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 877-78 (7th Cir. 1999) (stating that unpleasant conditions such as arbitrary reprimands, exclusion from office activities, lack of supervisor support, denial of a flex-time request, and harassing phone calls did not give rise to a claim of constructive discharge).

Accordingly,

**IT IS ORDERED** that JCPG's motion to strike the EEOC investigator's interview notes be and the same is hereby **GRANTED;**

**IT IS FURTHER ORDERED** that JCPG's motion for summary judgment be and the same is hereby **GRANTED.**

The clerk of court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 28th day of March, 2006.

BY THE COURT:

s/J.P. Stadtmueller
J.P. STADTMUELLER
U.S. District Judge